FILED

2007 SEP 25  AM 9: 11

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIMENSION ONE SPAS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>COVERPLAY, INC., an Oregon corporation, and E. JESS TUDOR, an individual,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIM | Civil No. 03cv1099-L(CAB)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

On April 24 and 25, 2007, this matter came on for a bench trial. Christopher S. Marchese, Esq., W. Chad Shear, Esq., and Lara S. Garner, Esq. appeared on behalf of Plaintiff and Counterdefendant Dimension One Spas, Inc. ("Dimension One"). JoAnna M. Esty, Esq., and Ben Whitwell, Esq. appeared on behalf of Defendants and Counterclaimants Coverplay, Inc. and E. Jess Tudor (collectively "Coverplay").

In this patent infringement action, the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

At the relevant time, Dimension One was involved in spa sales and spa manufacturing. In or around 1990, Phillip J. Salley ("Salley"), Dimension One's President, purchased a spa cover

lifter known as the Starlite Lifting Device ("Starlite"). Starlite is a device for removing and replacing a two-piece cover from and to a spa and storing the cover behind the spa. Salley purchased it to determine whether Dimension One could sell it as an accessory along with its spas. After assembling and operating Starlite, he determined it did not work very well and was cost prohibitive.

Subsequently, Salley, Edwin C. Sorensen ("Sorensen") and Roger J. Ouellette ("Ouellette;" Salley, Sorensen and Ouellette are sometimes hereinafter collectively referred to as "Inventors") developed a spa cover lift known as the Spa Cover Lift Assembly. They retained a patent law firm to prosecute a patent on their invention. On June 17, 1991, they filed a patent application with the United States Patent and Trademark Office ("PTO"). Shortly thereafter they filed a petition to make special. A petition to make special is a request to be put at the head of the examining line. *General Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1411 (Fed. Cir. 1994). The petition was filed on the grounds of prospective manufacture and was granted on November 18, 1991. On December 13, 1991, the PTO issued a Notice of Allowability, informing the Inventors that a Notice of Allowance and Issue Fee Due would be sent in due course and what additional action they needed to take. After sending out the Notice of Allowance and Issue Fee Due on December 16, 1991, the PTO examiner became aware of United States Patent No. 5,048,153 ("the Wall Patent"), which had issued on September 17, 1991. The Wall Patent application was filed in relation to Starlite; however, whether Starlite was an embodiment of the Wall Patent was disputed at trial. On February 2, 1992, the PTO issued a Second Notice of Allowability, and gave as the reason for allowance that:

> The Wall et al. reference alone or in combination with any of the prior art references of record does not teach applicant's invention of a spa cover because the Wall reference does not include a bridge member such that the cover is folded over the bridge arm.

The patent covering Inventors' Spa Cover Lift Assembly issued on July 21, 1992 as Patent No. 5,131, 102 (the "'102 Patent"). Dimension One is the assignee of the '102 Patent.

On June 2, 2003, Dimension One filed this patent infringement action, alleging that Coverplay's Cover*Up! and Forward Fulcrum devices infringed the '102 Patent. Coverplay

answered and filed a counterclaim seeking a declaratory judgment that the '102 Patent is invalid, unenforceable, and not infringed. In response to the Second Amended Complaint, Coverplay filed an answer and a counterclaim, which included the inequitable conduct defense based on Dimension One's failure to disclose the Wall Patent application and Starlite to the PTO.

Subsequently, the parties filed cross-motions for summary judgment pertaining to inequitable conduct. The court found that the PTO examiner considered the Wall Patent during the prosecution of the '102 Patent application, and that the nondisclosure of the Wall Patent application or the Wall Patent therefore did not constitute inequitable conduct. (Order Re: (1) Summ. J. Mot.; (2) Dimension One's Mot. to Strike Untimely Expert Opinions; and (3) Dimension One's Mot. to Strike Untimely Affirmative Defense and Countercl. filed Apr. 26, 2006 at 8.) There was a genuine issue of material fact whether Starlite was cumulative of the Wall Patent and whether its nondisclosure constituted inequitable conduct. (*Id.* at 15.) Accordingly, only the failure to disclose Starlite to the PTO was bifurcated for bench trial.

Because the bench trial was limited to Coverplay's inequitable conduct defense, the parties stipulated that Coverplay would present its evidence first. Coverplay called Salley as its only witness. Dimension One called Salley; Robert Hallam, Salley's character witness; James Campbell ("Campbell"), one of the Starlite inventors; and Larry Sheldon Nixon, an expert witness. Both sides introduced a number of exhibits.

I.

"[P]atent applicants are required to prosecute patent applications 'with candor, good faith, and honesty.'" *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1233 (Fed. Cir. 2003) (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995)); 37 C.F.R. § 1.56(a). "A breach of this duty may constitute inequitable conduct, which can arise from an affirmative representation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive or mislead the PTO." *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1128 (Fed. Cir. 2006); *see M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1339 (Fed. Cir. 2006); *Molins*, 48 F.3d at 1178.

Coverplay argues that "heightened duty" applies when an applicant files a petition to make special. (Defs' and Counterclaimants' Closing Argument and Post Trial Brief, filed May 16, 2007 ("Coverplay's Closing") at 3-4.) Dimension One submitted a petition to make special and expedite the processing of the '102 Patent application based on prospective manufacture. The Manual of Patent Examining Procedure ("MPEP")[1] requires an applicant filing a petition to make special based on manufacture to file a declaration to show, among other things, that "the applicant or assignee has made or caused to be made careful and thorough search of the of the prior art, or has a good knowledge of the pertinent prior art." (Ex. Z, MPEP § 708.02-I.) Coverplay assumes, without explaining, that requirements of the Special Examining Procedure for Certain New Applications -- Accelerated Examination (Ex. Z, MPEP § 708.02-VIII) also apply. Coverplay cites to no legal authority supporting this argument and the court has found none. Its interpretation contradicts the structure of the entire section 708.02 and the regulation it interprets. The PTO granted Dimension One's petition because it met "all the requirements of section 708.02-I." (Exh. B at 61.) The PTO did not determine that the requirements of paragraph VIII of its manual applied. (*See also* Reporter's Transcript of Proceedings ("Tr.") at 246.) The court therefore rejects Coverplay's heightened duty argument.

"The party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence." *See Digital Control Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006). "The 'clear and convincing' standard of proof of facts is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence.' Although not susceptible to precise definition, 'clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable." *Buildex, Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988) (internal citations, quotations and brackets omitted).

---

[1] "While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes and regulations as long as it is not in conflict therewith." *Molins*, 48 F.3d at 1180 n.10.

"Once a district court has found a threshold level of both materiality and intent to deceive, the district court must balance the evidence to determine if equity should render the patent unenforceable. The ultimate conclusion that a patent is unenforceable is an equitable decision committed to the discretion of the district court." *eSpeed, Inc. v. BrokerTec USA, L.L.C.*, 480 F.3d 1129, 1136 (Fed. Cir. 2007) (internal quotation marks and citations omitted).

The only alleged breach at issue for trial in this case is failure to disclose Starlite.[2] (*See* Order Granting Pl. and Counter-Def.'s Mot. to Strike Portions of Defs and Counterclaimants' Trial Brief filed Feb. 2, 2007.) Coverplay argues Dimension One breached its duty of candor, good faith and honesty because it did not disclose Starlite in the patent proceedings, and specifically in the petition to make special. To prevail on this claim, Coverplay must prove by clear and convincing evidence that Starlite was material to patentability and its omission was intentional.

## II.

### A.

Coverplay asserts that Starlite, its design defects, advertisement, assembly instructions, and safety warnings were not disclosed to the PTO and were material to patentability. Dimension One argues Starlite was not material to patentability because it was cumulative of the Wall Patent, which was considered by the PTO.[3]

---

[2] The inequitable conduct theories based on MPEP § 708.02-VIII, Starlite design defects, advertising, assembly instructions, and safety warnings were advanced by Coverplay for the first time at trial, and are not reflected as issues to be tried in the October 13, 2006 Pretrial Order. This is not the first time Coverplay has attempted inappropriately to change its inequitable conduct theory and sandbag its opponent. *See* Order Granting Pl.'s and Counterdef.'s Motion to Strike Portions of Defs' and Counterclaimants' Trial Brief, filed Feb. 2, 2007; Order Denying Defs' and Counterclaimants' Mot. *in Limine* No. 1, filed Dec. 15, 2006, at 5.)

[3] That the Wall Patent was not disclosed by the Inventors but was located by the examiner in his search is irrelevant to the issue of inequitable conduct. "When a reference has been considered by the examiner, it is not controlling how it came to the examiner's attention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1582 (Fed. Cir. 1991). "'When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner.'" *Molins*, 48 F.3d at 1185 (quoting *Scripps Clinic*, 927 F.2d at 1582). Even when patent applicants are aware of highly material prior art patents during prosecution of their application, there is no inequitable conduct if the reference comes before the PTO some way other than through the

Rule 56 of the patent regulations precludes a finding of materiality if the information is cumulative of information already of record or being made of record in the application. 37 C.F.R. § 1.56(b) (1992); *Digital Control*, 437 F.3d at 1319 ("a withheld otherwise material prior art reference is not material for the purposes of inequitable conduct if it is merely cumulative to that information considered by the examiner"); *Molins*, 48 F.3d at 1179; *Scripps Clinic*, 927 F.2d at 1582.

Coverplay argues Starlite is material under the older definition of materiality -- the reasonable examiner standard. This standard was contained in a prior version of Rule 56, and defined information as "material" when "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a) (1984); *Digital Control*, 437 F.3d at 1314; *Molins*, 48 F.3d at 1179 n.8. This version was in effect when the '102 Patent was prosecuted.[4]

The Rule was amended in 1992, to state in part that "information is material to patentability when it is not cumulative to information already of record or being made of record in the application." 37 C.F.R. § 1.56(b) (1992); *Digital Control*, 437 F.3d at 1314; *Molins*, 48 F.3d at 1179 n.8. "This new standard was not intended to constitute a significant substantive break with the pre-1992 standard." *Purdue Pharma*, 438 F.3d at 1129 n.6. Both versions of the rule are intended to reach the same conclusion. "[I]f a misstatement or omission is material under the new Rule 56, it is material. Similarly, if a misstatement or omission is material under the 'reasonable examiner' standard or under the older three tests,[5] it is also material." *Impax*

---

applicants' disclosure. *Id.* at 1185. As provided in the PTO's regulations, "[t]he duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office *or* submitted to the Office [by the patent applicant]." 37 C.F.R. § 1.56(a) (emphasis added).

[4] "According to the PTO's notice of final rulemaking, the rule change applied to all applications pending or filed after March 16, 1992." *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1352 (Fed. Cir. 2005).

[5] "The 'older three tests' include (1) the objective 'but for' standard, where the misrepresentation was so material that the patent should not have issued, (2) the subjective 'but for' test, where the misrepresentation actually caused the examiner to approve the patent application when he would not otherwise have done so, and (3) the 'but it may have' standard, where the misrepresentation may have influenced the patent examiner in the course of

*Labs., Inc. v. Aventis Pharm. Inc.*, 468 F.3d 1366, 1374 (Fed. Cir. 2006) (footnote in original) (internal quotation marks and citation omitted).  Under the reasonable examiner standard, "[i]f the information allegedly withheld is not as pertinent as that considered by the examiner, or is merely cumulative to that considered by the examiner, such information is not material." *Molins*, 48 F.3d at 1179; *see also Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1575 (Fed. Cir. 1997) ("even where an applicant fails to disclose an otherwise material prior art reference, that failure will not support a finding of inequitable conduct if the reference is simply cumulative to other references, *i.e.*, if the reference teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO").  "A reference that is simply cumulative to other references does not meet the threshold of materiality that is predicate to a holding of inequitable conduct." *Scripps Clinic*, 927 F.2d at 1582 (predating amended Rule 56).  Under either version of Rule 56, information is not material if it is cumulative of the information considered by the PTO.

B.

Coverplay contends that although it bears the burden of proof of inequitable conduct, the burden is on Dimension One to prove cumulativeness, and argues that cumulativeness is a defense to the inequitable conduct defense. (*See* Coverplay's Closing at 8.)  This argument is not supported by law.  The case most on point is *Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F.3d 1331 (Fed. Cir. 2001), where the inequitable conduct defense was based on failure to disclose a prior art reference which was cited in parallel patent proceedings abroad.  The party opposing inequitable conduct argued the reference was not material because it was cumulative.  The court found the proponent of the defense failed to meet its burden on both the intent prong and the materiality prong, because it "failed to overcome the evidence that the [reference was] cumulative art." *Id.* at 1349.

*Tegal* suggests that although Dimension One may have the burden of producing evidence showing that Starlite is cumulative of the Wall Patent, the burden of persuasion (by clear and

---

prosecution." *Impax Labs.*, 468 F.3d at 1374 n.5.

1  convincing evidence) remains with Coverplay.  This is consistent with case law predating the
2  amended Rule 56 and with the amended rule itself, which includes "not cumulative to
3  information already of record," in the definition of materiality, an element on which the
4  proponent of the defense bears the burden, rather than making it a separate exception or defense
5  to inequitable conduct.  37 C.F.R. § 1.56(b) (1992); *Scripps Clinic*, 927 F.2d at 1582 ("A
6  reference that is simply cumulative to other references does not meet the threshold of materiality
7  that is predicate to a holding of inequitable conduct.").
8       Coverplay relies on *FMC Corporation v. Mantowoc Company, Inc.*, 835 F.2d 1411, 1415
9  (Fed. Cir. 1987), for the proposition that "the '102 Inventors must rebut Coverplay's showing by
10 demonstrating that the prior art or information was . . . merely cumulative with prior art or
11 information cited to or by the USPTO." (Coverplay's Closing at 8.)  *FMC* does not support this
12 proposition.  It affirmed the trial court's finding of no intent and it did not address the trial
13 court's materiality findings.  *FMC Corp.*, 835 F.2d at 1415 & n.7 (the dispute which relates to
14 materiality "need not here be addressed in detail, for a determination of inequitable conduct
15 requires findings on materiality and intent and the district court here found the intent element
16 totally absent, 'even if' the documents were regarded as pertinent prior art").
17      Coverplay also cites *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556 (Fed. Cir.
18 1983), which held that while "fraud on the PTO must be proved by clear, unequivocal, and
19 convincing evidence[,] where intentional misrepresentations have been made, . . . a complete
20 'cure' must also be demonstrated by clear, unequivocal, and convincing evidence." 722 F.2d at
21 1572.  *Rohm & Haas* does not address failure to disclose and the instant case does not involve
22 intentional misrepresentations.  In addition, Dimension One does not contend it attempted to
23 correct or cure the non-disclosure.  *Rohm & Haas* is therefore inapposite.
24      Coverplay further argues that "[i]nequitable conduct can be *excused* if the '102 Inventors
25 demonstrate that the non-disclosed material prior art reference is cumulative to other references
26 before the examiner."(Coverplay's Closing at 8 (citing *Novo Nordisk Pharm., Inc. v. Bio-*
27 *Technology Gen'l Corp.*, 424 F.3d 1347 (Fed. Cir. 2005) (emphasis added).)  Although *Novo*
28 /////

*Nordisk* addressed a cumulativeness argument, it did not hold that cumulativeness is an excuse, and did not differ in any respect from the prior law regarding materiality and cumulativeness.

Coverplay's argument about the burden of proof is not supported by law. Lack of cumulativeness is an element of materiality as defined by the amended Rule 56 as well as under case law preceding it. *See Scripps Clinic*, 927 F.2d at 1582. Coverplay has the burden to prove materiality by clear and convincing evidence.

C.

Assuming, *arguendo*, that Dimension One had the burden to prove Starlite was cumulative of the Wall Patent, it presented sufficient evidence to meet the burden. In considering the cumulativeness issue, the court finds most pertinent Campbell's testimony, because he designed and manufactured Starlite, and is listed as one of the inventors on the Wall Patent. (Exh. 8.) The patent was assigned to Starlite Leisure Products, Inc. (*Id.*) Campbell was the company's General Manager during the relevant time. (Tr. at 162.) He referred to the Wall Patent as "our patent on the Starlite Superlift." (*Id.*)

Of the people involved in the design of Starlite, Campbell is the most knowledgeable about Starlite and the Wall Patent. (*Id.* at 168-69.) He was involved in Starlite's design on a day-to-day basis for six to seven months, and subsequently built its only production run of 125 units. (*Id.* at 169.) Before putting the device on the market, the inventors retained patent attorneys and applied for a patent. (*Id.* at 170.) Campbell was involved in the patent application process. (*Id.* at 180-81.) The figures in the Wall Patent accurately depict Starlite without any differences. (*Id.* at 172, 173.) Each of the 125 Starlite units produced was the same as the device depicted in the figures contained in the Wall Patent. (*Id.* at 176.) Salley testified that even upon a cursory examination, the figures were the same as the Starlite he installed. (*Id.* at 127-28.) According to Campbell, the attorneys who produced the drawings had the actual device for reference. (*Id.* at 172-73, 181.) Campbell reviewed the drawings for accuracy during the patent application process. (*Id.* at 181.) Some of the same figures were used for the assembly instructions when Starlite devices were shipped. (*Id.* at 177.) Campbell was involved in the drafting of the instructions. (*Id.* at 194.) The Wall Patent states that it illustrates and

1  describes the "preferred embodiment of the invention." (Exh. 8 at 5:12-13.) This testimony was
2  not controverted by Coverplay. The court therefore finds that Starlite is cumulative of the Wall
3  Patent.
4     Coverplay argues Starlite's design defects, advertisement, assembly instructions and
5  safety warnings were material and not disclosed in the Wall Patent, and were therefore not
6  cumulative. Salley and Campbell both testified about Starlite's design defects. Campbell
7  testified that the foot plates, which slipped under the spa, moved and required constant
8  adjustment over time, because they were held in place only by the weight of the spa. (*Id.* at 178-
9  79, 197, 200.) Salley testified that the device lacked structural rigidity, and that this problem
10 was exacerbated because the side arms were spring-loaded. (*Id.* at 101-02, 105-06.) Both
11 testified the method of attaching Starlite to the spa cover required puncturing the cover itself,
12 which would cause the cover to take on water over time. (*Id.* at 49, 100, 102, 104 (Salley); *id.* at
13 186-87 (Campbell).) These defects are a natural consequence of Starlite's design, which is
14 disclosed by the Wall Patent.
15    Coverplay offers no reason why these defects are material to patentability of the '102
16 Patent, instead, it relies on two cases for the proposition that product testing is material and
17 withholding this information constitutes inequitable conduct. Contrary to Coverplay's argument,
18 product testing is not always material. *See Impax Labs.*, 468 F.3d at 1377-78. In *eSpeed, Inc. v.
19 BrokerTec USA*, the inequitable conduct finding was affirmed because the patent applicant
20 submitted affidavits containing false statements pertaining to a prior version of the invention in
21 an effort to cure prior nondisclosure. 480 F.3d at 1133, 1136. The court based its decision on
22 the rule that "the submission of a false affidavit may be determined to be inherently material."
23 *Id.* at 1136 (internal quotation marks and citation omitted). The instant case does not involve
24 affirmative misrepresentations or false affidavits. Moreover, cumulativeness was not an issue in
25 *eSpeed*. In *Cargill Incorporated v. Canbra Foods, Ltd.*, inequitable conduct was found based on
26 failure to disclose test results which contradicted the test data the applicant included in the
27 specification, and which the applicant used to overcome the examiner's rejection. 476 F.3d
28 1359, 1362-63, 1365 & n.2. These circumstances are not analogous to the instant case.

Furthermore, as with *eSpeed*, in *Cargill* cumulativeness was not an issue. The court therefore rejects Coverplay's argument that Starlite's design defects added any material information to what was disclosed in the Wall Patent.

Coverplay argues that Starlite assembly instructions add material information to the Wall Patent. Based on Campbell's testimony it maintains the assembly instructions explained how to assemble Starlite and attach a spa cover, and how to modify the device to fit different spa covers, which required cutting the tortion bar. (Coverplay's Closing at 17-18.) Although Campbell initially testified on cross-examination that several items which were included in the assembly instructions were not disclosed in the Wall Patent, he did not have an opportunity to consult the text of the Wall Patent before answering. He corrected his testimony after he reviewed it. (Tr. at 191-201 (patent does not include the information); *but cf. id.* at 202 (did not have the occasion during cross-examination to read through the entire patent), 202-06 (patent includes the information).) Specifically, the Wall Patent disclosed how to adjust the device for spa covers of different weight by adjusting spring tension. (*Id.* at 205-06; Exh. 8 at 4:32-42.) Since the patent does not specify the length of the tortion bar, it does not discuss adjusting its length to adjust the device to the size of the spa. (*See* Tr. at 204.) The figures illustrating the invention show that the tortion bar is the same length as the width of the spa. (Exh. 8.) Accordingly, a device to fit any size of spa could be constructed based on the figures and text of the patent. Although the patent does not include assembly instructions themselves, the figures it contains were used for the assembly instructions. (Tr. at 177.) Coverplay does not explain how the information which is contained in the assembly instructions but not in the Wall Patent is material to patentability of the '102 Patent. The court finds that the difference is not material to patentability.

The only testimony pertaining to the safety instructions was that they were included with the assembly instructions and included a warning about the spring-loaded side arms. (Tr. at 172.) The Wall Patent discloses that the side arms are spring loaded, and that the spring tension may be adjusted. (Tr. at 205-06; Exh. 8 Figs. 1A, 2, 3 & at 3:53-57, 4:26-42, 58-66; 5:30-35; 6:10-16.) The court finds that the safety warning is not material to patentability.
/ / / / /

  Last, Coverplay does not explain how the advertisement adds anything to what is disclosed in the Wall Patent. When Starlite was being marketed, ads depicting it were put into industry magazines. (Tr. at 174-75 & Exh. R.) The photograph of the Starlite device in the ads was identical to the Starlite devices which were produced for sale and the figures in the Wall Patent. (Tr. at 176.) If anything, comparing the advertisement with the patent shows that the advertisement discloses less than the patent. The court therefore finds the advertisement is not material to patentability.

  For the foregoing reasons, the court finds that Starlite, its design defects, assembly instructions, safety warning and advertisement are cumulative of the Wall Patent and therefore not material. This alone precludes a finding of inequitable conduct.

### III.

  In the alternative, the court considers whether Coverplay established by clear and convincing evidence the element of intent. This element requires proof "that the applicant had the specific intent to accomplish an act that the applicant ought not to have performed, *viz.*, misleading or deceiving the PTO. In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known reference." *Molins*, 48 F.3d at 1181.

  Direct evidence of intent to deceive or mislead the PTO is not necessary and is "rarely available." *Purdue Pharma*, 438 F.3d at 1133 (internal quotations omitted); *Digital Control*, 437 F.3d at 1319; *Bristol-Myers*, 326 F.3d at 1239; *Molins*, 48 F.3d at 1180. Intent may be inferred from the totality of the facts and circumstances surrounding the applicant's conduct. *Purdue Pharma*, 438 F.3d at 1134; *Digital Control*, 437 F.3d at 1319; *Molins*, F.3d at 1180-81. "The intent element of inequitable conduct requires that the involved conduct, viewed in light of all the evidence, including evidence of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Cargill*, 476 F.3d at 1364 (internal quotation marks and citations omitted); *see also Purdue Pharma*, 438 F.3d at 1134. "'[A] patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish subjective good faith sufficient to prevent the drawing of an

inference of intent to mislead.'" *Purdue Pharma*, 438 F.3d at 1134 (quoting *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed. Cir. 1997)). "Nevertheless, it is important to remember that materiality does not presume intent, which is a separate and essential component of inequitable conduct." *Id.* (internal quotations omitted); *M. Eagles*, 439 F.3d at 1340. Where, as here, a charge of inequitable conduct is based on the failure to disclose, "'[i]ntent to deceive can not be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent.'" *M. Eagles*, 439 F.3d at 1340 (quoting *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996)). Further, gross negligence is not sufficient to establish intent. *Id.* at 1343.

The evidence of intent was presented though Salley's testimony. Salley saw an ad for Starlite and purchased the device with the intent to see if it was a product Dimension One could sell it as an accessory to its spas. (*Id.* at 29, 31, 41.) He had someone assemble and attach Starlite to a spa and spa cover, as the device was sold solely as a lifter without a spa or cover. (*Id.* at 34, 36.) He did not remember whether the device was accompanied by assembly instructions, and did not observe the assembly and installation of Starlite. (*Id.* at 34, 39, 92.) Upon examining and operating the device, he noticed a number of shortcomings. (*Id.* at 107, 120.) The solutions to those shortcomings did not immediately occur to him. (*Id.* at 50.) He then had it disassembled and removed. (*Id.* at 41, 108, 122.) This was the last time Salley saw Starlite. (*Id.* at 41, 108.) He believes it was stored in a room adjacent to the research and development room, along with other unused items, however, he did not recall seeing it there, and did not look for it after he directed that it be disassembled. (*Id.* at 122-24.)

Approximately nine to twelve months later, Salley asked Sorensen to assign Ouellette to the project of developing a spa cover lifter. (*Id.* at 54, 107-08.) Salley put a lot of thought into the design and knew what kind of product would be commercially successful, but he did not know how to put it together. (*Id.* at 110, 112.) Ouellette was very creative and was the primary hands-on designer of the device. (*Id.* at 54; *see also id.* at 110.) Salley inspected and tested the prototypes designed by Ouellette and Sorensen, and made suggestions. (*Id.* at 111-12.) The design process involved several prototypes, including one involving a two-piece cover, where

1 | each half of the cover opened toward the opposite side of the spa (*id.* at 111), and one involving
2 | strong foot leverage to lift the cover (*id.* at 112-13). None of these designs were incorporated
3 | into the device disclosed in the '102 Patent. (*Id.* at 111-13.) Dimension One's device was not
4 | based on Starlite. (*Id.* at 38, 121.)

5 |     At some point during the design process, Salley decided to patent the device he invented
6 | together with Sorensen and Ouellette. (*Id.* at 52.) Salley is not an attorney and has no training in
7 | patent law. (*Id.* at 116-17.) He was involved in the process of obtaining a patent once before.
8 | (*Id.* at 63.) He was not very familiar with the process or the law applicable to patent
9 | applications. (*Id.* at 64.) Dimension One retained a patent firm for the application process. (*Id.*
10 | at 52.) Salley was involved in the patent application process and reviewed the application. He
11 | does not recall whether he told the counsel about Starlite. (*Id.* at 56, 57.) He did not provide the
12 | device to counsel. (*Id.* at 56.) He does not know where Starlite was when the application was
13 | filed. (*Id.* at 108.) He saw Starlite was not referred to in the application and did not take any
14 | steps to include it. (*Id.* at 58-59.)

15 |     When he examined Starlite, Salley saw it was stamped "patent pending." (*Id.* at 37; *see*
16 | *also id.* at 176-77 (Campbell).) He understood this to mean that a patent application had been
17 | filed, the patent office had the application, and that the application was not accessible to him to
18 | give to his counsel or for his counsel to otherwise obtain. (*Id.* at 37, 59, 76, 77.) He concluded
19 | there was no paperwork which could be presented to the patent office regarding Starlite. (*Id.* at
20 | 59, 76.) He understood "prior art" to mean "paperwork" or "patents on file." (*Id.* at 63.) The
21 | patent counsel engaged a prior art search firm to perform the patentability search, and the results
22 | of the search were given to the patent examiner. (*Id.* at 114-15, 128-29.)

23 |     Dimension One filed an information disclosure statement in conjunction with its patent
24 | application and petition to make special, which listed several patent references but did not
25 | include Starlite. (Exh. B at 50 & 52; Tr. at 67-74.) The patent references listed were discovered
26 | by the search firm. (*Id.* at 129-30.) Salley understood that if a device is patented, the patent
27 | search would bring it up and it would be submitted to the examiner as a reference. (*Id.* at 76.) If
28 | a patent or patent-pending information regarding Starlite were available to him, he would have

submitted it. (*Id.* at 76, 77.) Based on his understanding at the time, however, there was nothing to submit. (*Id.* at 76, 77.) His intent was not to deceive the examiner, and he did not believe that he deceived him. (*Id.* at 121.)

Coverplay did present contrary evidence, but argues on various grounds why Salley's testimony should not be believed. The court finds Coverplay's arguments do not support an inference of intent to deceive the PTO by clear and convincing evidence.

Coverplay argues Salley admitted Starlite was material, and therefore knowingly withheld a material reference. (*See* Coverplay's Closing at 20.) Coverplay offers Salley's opinion that "taken as whole -- the entire '102 device . . . had more in common with the Starlite device than it had in common with any of the references that you had put forward in the application." (Tr. at 76.) Later examination revealed that Salley's response, given in a fast-paced adversary examination, was based solely on his cursory review during the examination of some, but not all, of the pertinent drawings and no review of the text of the patents submitted as references. (*Id.* at 117.) Moreover, Coverplay's line of questioning was contrary to its own position that the '102 Patent is invalid because each of its claims was covered by the Perry Patent. (Exh. 16; Tr. at 214-18.) The Perry Patent was listed in Dimension One's disclosure statement to the PTO. (Exh. B at 52.) Accordingly, the court rejects Coverplay's suggestion that Dimension One knowingly withheld a material reference. Finally, had Salley submitted Starlite to the PTO, there is no telling whether the PTO had the resources to assemble and operate it, since the device did not include a spa or a cover to which it attached.

The court also rejects the suggestion the Inventors intended to effectively steal Starlite's features and use them for their own patent. (Coverplay's Closing at 20.) In light of substantial lapse of time between his examination of Starlite and start of designing the '102 Patent device, and the description of the design process, including various prototypes which greatly differ from Starlite, the court credits Salley's testimony that the '102 Patent device was not designed based on Starlite. Coverplay's reliance on the testimony that Salley wanted a better product than Starlite or a product without Starlite's defects overstates its significance. (Coverplay's Closing at 16.) The testimony more readily lends itself to the interpretation that were Salley satisfied

with Starlite, Dimension One would have sold it rather than undertaken to design its own device. (*See id.* at 41.)

Coverplay's argument that Salley is an opportunist not above taking advantage of an inventor who decided to market his device without first obtaining a patent, and therefore not credible (Coverplay's Closing at 20), is likewise not supported by clear and convincing evidence. It is based on Salley's opinions about patent law. However, he testified, and Coverplay does not dispute, that he has no training in patent law and is not qualified to opine on such matters. (*See* Tr. at 64 ("You are asking me a question that I can only speculate on."), 63-64, 116-17.)

Last, Coverplay contends it impeached Salley's credibility with his deposition testimony about the reasons for not disclosing Starlite. (Coverplay's Closing at 21.) In his June 2005 deposition (Tr. at 32), Salley testified he did not know why Starlite was not disclosed in the information disclosure statement (*id.* at 78). At trial, he was asked why *he* did not disclose Starlite. (*Id.* at 76 ("Was your sole reason not to disclose the Starlite device based on the fact that it was patent pending?").) These are two different questions, and the answers are not inconsistent. In subsequent questioning at trial, counsel characterized the deposition testimony as pertaining to Salley's reasons for non-disclosure. Assuming this was Salley's intent at deposition (*see id.* at 78), the court notes that almost two years had elapsed between the deposition and trial, and finds credible his explanation that he did not know whether he remembered the reasons after his deposition or just did not think of them at that time (*id.* at 79). Overall, Coverplay's attempted impeachment, together with other testimony relied upon by Coverplay, is insufficient to make a showing by clear and convincing evidence of specific intent to deceive the PTO.

Accordingly, the court finds Coverplay has not met its burden to prove by clear and convincing evidence specific intent to deceive the PTO. This is an alternative reason which alone precludes a finding of inequitable conduct.

/ / / / /

/ / / / /

IV.

Based on the foregoing, the court is not left with an "abiding conviction" that it is "highly probable" that Dimension One or the Inventors deliberately withheld from the PTO a reference they knew was material to patentability of the '102 Patent. *See Buildex*, 849 F.2d at 1463. Accordingly, the court finds no inequitable conduct in this case.

The parties are instructed to contact chambers of Magistrate Judge Bencivengo to establish a case management schedule.

**IT IS SO ORDERED.**

Dated: September 24, 2007

M. JAMES LORENZ
UNITED STATES DISTRICT JUDGE

COPY TO:

HON. CATHY ANN BENCIVENGO
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL