1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                       SOUTHERN DISTRICT OF CALIFORNIA

10

11  DIMENSION ONE SPAS, INC., a          )   Civil No. 03cv1099-L(CAB)
    California corporation,              )
12                                       )   **ORDER:**
                      Plaintiff,         )
13                                       )   **(1)  GRANTING IN PART AND
    v.                                   )   DENYING IN PART PLAINTIFF'S
14                                       )   MOTION FOR SUMMARY
    COVERPLAY, INC., an Oregon           )   JUDGMENT THAT DEFENDANTS'
15  corporation, and E. JESS TUDOR, an   )   ACCUSED PRODUCTS
    individual,                          )   LITERALLY INFRINGE THE
16                                       )   PATENT-IN-SUIT [# 391];
                      Defendants.        )   (2)  GRANTING IN PART AND
17  _____  )   DENYING IN PART DEFENDANTS'
                                         )   CONSOLIDATED MOTION FOR
18  AND RELATED COUNTERCLAIM             )   SUMMARY JUDGMENT OF NON-
                                         )   INFRINGEMENT OR, IF DENIED,
19                                       )   FOR INVALIDITY [#406];
                                         )   (3)  GRANTING PLAINTIFF'S
20                                       )   MOTION TO STRIKE UNTIMELY
                                         )   EXPERT OPINIONS OF DR. VIJAY
21                                       )   GUPTA [#390];
                                         )   (4)  GRANTING PLAINTIFF'S
22                                       )   MOTION FOR PARTIAL
                                         )   SUMMARY JUDGMENT OF NO
23                                       )   LACHES AND NO ESTOPPEL
                                         )   [#392]; AND
24                                       )   (5)  DENYING DEFENDANTS'
                                         )   MOTION FOR SUMMARY
25                                       )   JUDGMENT ON PLAINTIFF'S
                                         )   STATE LAW CLAIMS [#405]**
26  _____  )

27

28

In this patent infringement action, the parties filed cross-motions for summary adjudication.  Plaintiff and Counterdefendant Dimension One Spas, Inc. ("Dimension One") filed motions for summary adjudication of its infringement claim and of Defendants and Counterclaimants Coverplay, Inc.'s and E. Jess Tudor's (collectively "Coverplay") defenses of laches and equitable estoppel.  Coverplay filed a motion for summary adjudication of its counterclaim for declaration of non-infringement and invalidity and of Dimension One's sate law claims.  Dimension One also filed a motion to strike the invalidity opinions of Coverplay's expert Vijay Gupta.  The parties opposed each other's motions.  For the reasons which follow, Plaintiff's motion for summary judgment that Defendants' accused products literally infringe the patent-in-suit is **GRANTED IN PART AND DENIED IN PART**; Defendants' consolidated motion for summary judgment of non-infringement or, if denied, for invalidity is **GRANTED IN PART AND DENIED IN PART**; Plaintiff's motion to strike untimely expert opinions of Dr. Vijay Gupta is **GRANTED**; Plaintiff's motion for partial summary judgment of no laches and no estoppel is **GRANTED**; and Defendants' motion for summary judgment on Plaintiff's state law claims is **DENIED**.

At the relevant time, Dimension One was involved in spa sales and manufacturing. It is the assignee of U.S. Patent No. 5,131,102 ("the '102 Patent") entitled "Spa Cover Lift Assembly," which facilitates removal of a spa cover from atop a spa.  Dimension One alleges that Coverplay infringed the '102 Patent by making, using, offering for sale, selling and/or importing spa cover lifts, including Cover*Up! and Forward Fulcrum spa cover lifts.  (Second Am. Compl. at 4.)

Federal Rule of Civil Procedure 56 empowers the court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986).  "If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue." Fed. R. Civ. P. 56(d).

Summary judgment or adjudication of issues is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

03cv1099

1   there is no genuine issue as to any material fact and that the moving party is entitled to judgment

2   as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the

3   case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" of material

4   fact arises if "the evidence is such that a reasonable jury could return a verdict for the

5   nonmoving party."  *Id.*

6          The burden on the party moving for summary judgment depends on who bears the burden

7   of proof at trial.  For example, Dimension One bears the burden of proof on its infringement

8   claim.  *See Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 819 (Fed. Cir. 1992).  "When

9   the party moving for summary judgment would bear the burden of proof at trial, it must come

10  forward with evidence which would entitle it to a directed verdict if the evidence went

11  uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the

12  absence of a genuine issue of fact on each issue material to its case."  *See C.A.R. Transp.*

13  *Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations

14  omitted).  On the other hand, Coverplay as the moving party with respect to the same claim

15  would meet its burden by pointing out the absence of evidence with respect to any one element

16  of Dimension One's claim.  *See Celotex*, 477 U.S. at 325.

17         If the movant meets its burden, the burden shifts to the nonmovant to show summary

18  adjudication is not appropriate.  *Celotex*, 477 U.S. at 317, 324.  The nonmovant does not meet

19  this burden by showing "some metaphysical doubt as to material facts."  *Matsushita Elec. Indus.*

20  *Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmovant must go beyond the

21  pleadings to designate specific facts showing there are genuine factual issues which "can be

22  resolved only by a finder of fact because they may reasonably be resolved in favor of either

23  party."  *Anderson*, 477 U.S. at 250.

24         When ruling on a summary judgment motion, all of the nonmovant's evidence is to be

25  believed, and all justifiable inferences are to be drawn in its favor.  *Anderson*, 477 U.S. at 255.

26  Determinations regarding credibility, the weighing of evidence, and the drawing of legitimate

27  inferences are jury functions, and are not appropriate for resolution by the court on a summary

28  / / / / /

1  judgment motion.  *Id.*  Only admissible evidence may be considered in deciding a motion for

2  summary judgment.  *See* Fed. R. Civ. P. 56(e).

3  **CROSS-MOTIONS REGARDING INFRINGEMENT**

4       Dimension One claims that Coverplay's products infringe the '102 Patent literally, or in

5  the alternative, under the doctrine of equivalents.  Both, literal infringement claims and claims of

6  infringement under the doctrine of equivalents may be decided by summary judgment when the

7  summary judgment standard is met.  *Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir.

8  1998).

9       There is patent infringement if any one of the patent's claims covers the alleged

10  infringer's product or process.  *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d

11  878, 889 (Fed. Cir. 1988.)  "For literal infringement, each limitation of the claim must be met by

12  the accused device exactly, any deviation from the claim precluding a finding of infringement."

13  *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 547 (Fed. Cir. 1994).  "Determining whether a

14  patent claim has been infringed involves two steps: (1) claim construction to determine the scope

15  of the claims, followed by (2) determination whether the properly construed claim encompasses

16  the accused structure."  *Id.*  The first step, claim construction, is a matter of law.  *Id.*  The court

17  has already completed this step when it construed the claims of the '102 Patent.  (*See* Order

18  Construing Claims, filed Dec. 2, 2005.)  "The second step, determination of infringement,

19  whether literal or under the doctrine of equivalents, is a question of fact."  *Bai*, 160 F.3d at 1353.

20  The court must compare the patent claims, as construed, to the accused device to determine

21  whether all of the claim limitations are present either literally or by a substantial equivalent.

22  *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002).

23       Where the relevant aspects of the accused device's structure and operation are

24  undisputed, the issue of infringement turns on claim interpretation.  *Johnson Worldwide Assoc.,*

25  *Inc. v. Zebco Corp.*, 175 F.3d 985, 988-89 (Fed. Cir. 1999).  The structure and operation of

26  Coverplay's products are not disputed in this case.  (Pl.'s Mem. of P.&A. in Supp. of Its Mot. for

27  Summ. J. at 4; Defs' Opp'n to Pl.'s Mot. for Summ. J. at 4.)

28  / / / / /

Dimension One alleged that Coverplay infringed one or more claims of the '102 Patent. Claim 1 is the only independent claim. (*See* Order Construing Claims at 4-5.)  It has four elements:

> (1) "a pair of pivoting supports;"

> (2) "pivot means, adapted to be secured adjacent one side of a spa, and having a common pivot axis for facilitating pivoting said pair of pivoting supports about said common axis;"

> (3)  "each pivoting support having a first end pivotally attached to said pivot means to pivot about said common axis, and each having a second end;" and

> (4)  "an upper bridge arm connected to said second ends of said pair of pivoting supports, said upper bridge arm pivotable to a first position adjacent and parallel to said hinge of said spa cover when covering said spa and to a second position clear of said spa where said cover sections are folded over said upper bridge arm and said upper bridge arm is pivoted to said second position to remove said cover from said spa and support said cover to one side of said spa."

(Garner Decl. in Supp. of Pl.'s Mot. for Summ. J. Ex. A.)  "[I]f an accused infringer does not infringe an independent claim, it cannot infringe claims that depend on that independent claim." *Streamfeeder, LLC v. Sure-Feed Sys., Inc.*, 175 F.3d 974, 984 (Fed. Cir. 1999).

In its motion, Dimension One presented evidence that Coverplay's devices infringed each element of Claim 1 and Claim 2.  In opposition to Dimension One's motion and in support of its own motion on its non-infringement claim, Coverplay argued that it does not infringe the '102 Patent because the "pivot means" limitation is not found in its products and that its CoverPro products do not infringe because they do not have an "upper bridge arm," another element of Claim 1.[1]  Coverplay does not dispute that all the other elements are found in its products.

**Pivot Means**

The "pivot means" limitation is a means-plus-function limitation under 35 U.S.C. § 112 ¶ 6.  (Claim Construction Order at 17.)  A means-plus-function limitation recites a function to be performed rather than a defined structure.  *Lockheed Martin v. Space Sys. Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003).  "Literal infringement of a § 112, ¶ 6 limitation requires that the

---

[1]     On cross-motions, the court must consider evidence submitted in support of and in opposition to both motions before ruling on either one.  *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

1   relevant structure in the accused device perform the identical function recited in the claim and be

2   identical or equivalent to the corresponding structure in the specification." *Frank's Casing Crew*

3   *& Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004) (internal

4   quotation marks and citations omitted).   Accordingly, the inquiry has two elements:  "an

5   accused device must (1) perform the identical function recited in the means limitation and (2)

6   perform that function using the structure disclosed in the specification or an equivalent

7   structure."  *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1578 (Fed. Cir. 1993).

8        The structure of the pivot means disclosed by the '102 Patent is "(1) one pivot block and

9   a pair of lower corner bars; (2) a pair of pivot blocks and a pair of lower corner bars; (3)

10  equivalents of structures (1) and (2)." (Claim Construction Order at 20.)  According to the '102

11  Patent specification, "[a] pivot block 27 is typically a two piece or one piece structure having a

12  bore 37, when assembled, extending completely therethrough.  The diameter of bore 37 will be

13  greater than the outside diameter of corner bar 29 in order that one portion of corner bar 29 may

14  extend through and be rotatably supported by pivot block 27."  (Garner Decl. in Supp. of Pl.'s

15  Mot. for Summ. J. Ex. A, '102 Patent at col. 4:21-26.)  The pivot block is attached to the spa or

16  the ground with screws, while the corner bar (an elbow shaped bar) is connected to the pivoting

17  support (a side arm) either by fitting the pivoting support into the corner bar or fitting the corner

18  bar into the pivoting support.  (*See id*. at col. 3:25-col. 4:49.)  The relevant components of the

19  pivot means structure are a pivot block and a corner bar.

20       Coverplay has used two relevant structures.  The VersaMount assembly has been used

21  since 1998, and the flange assembly was used before that time.  (Tudor Decl. in Supp. of Defs'

22  Consol Mot. for Summ. J.[2] at 2.)  Each of these structures consists of two components.

23       The flange assembly consisted of a threaded female flange which accepted a male

24  threaded elbow.  (*Id*. at 3 & Ex. 6.)  The other end of the elbow was female and threaded to

25  accept a threaded nipple, which fit into the end of the side arm.  (*Id*.)

26  / / / / /

27  

28      [2]      Coverplay filed an almost identical declaration in support of its motion for
summary adjudication of non-infringement and, in the alternative, invalidity.

6                                                          03cv1099

1    The VersaMount assembly consists of an angled plate with a threaded nipple and a

2    threaded elbow. (*Id*. at 2 & Ex. 4 & 5.) The cast iron plate is angled at 90 degrees, which

3    permits it to be stood upright. (*Id*. at 2-3 & Ex. 4, 5.) Screw holes are machined into the plate to

4    permit it to be attached to either side of the spa or the deck. (*Id*.) The upright part of the plate

5    has a post sticking out at a 90 degree angle. (*Id*. at 3 & Ex. 4 & 5.) The post has machined

6    threads at the end of it. (*Id*.) The elbow piece has a threaded female end which threads around

7    the threaded nipple and onto the threaded post of the angled plate. (*Id*.) The un-threaded male

8    end fits into the end of the side arm and is held in place by a screw. (*Id*.)

9    The court interpreted the function of the pivot means limitation of the '102 Patent to be

10   "facilitating pivoting the pivoting supports about a common axis." (Claim Construction Order at

11   18.) Coverplay distinguishes its products arguing that they are not limited to a single pivot

12   means and that its flange and VersaMount assemblies do not pivot the pivoting supports, *i.e.*,

13   side arms, about a common axis.

14   Regarding the single pivot means limitation, Coverplay argues that "[i]n contrast to the

15   single pivot means limitation of Claim 1, all of Coverplay's products include either two of the

16   earlier [flange] assembly, or two of the VersaMounts. Each of either the earlier [flange]

17   assembly or the VersaMount pivots *a* single pending arm, not the *pair* of pending arms, of the

18   accused products." (Defs' Opp'n to Pl.'s Mot. for Summ. J. at 9.) Coverplay's products use a

19   pair of either flange or VersaMount assemblies to rotate a pair of elbows attached to the pending

20   arms. (Tudor Decl. in Supp. of Defs' Consol Mot. for Summ. J. Tudor at 3 & Ex. 7 (assembly

21   instructions).) Each assembly rotates one pending arm on each side of the spa. (*Id*. at 3 & Ex.

22   7.)

23   The court construed "pivot means" as "one 'pivot means' structure" "made up of multiple

24   components. For example, the entire pivot means structure can be made up of a pair of pivot

25   blocks and a pair of lower corner bars." (Claim Construction Order at 21.) This follows the

26   court's definition of the "pivot means" structure as including "a pair of pivot blocks and a pair of

27   lower corner bars." (*Id*. at 20.) Accordingly, Coverplay's argument that its products do not

28   infringe because each of its assemblies pivots only one side arm on each side of the spa is

1   rejected.  There is no genuine issue of fact whether the accused products meet the single pivot

2   means limitation.

3        Regarding the common pivot axis, Coverplay argues that its flange and VersaMount

4   assemblies do not pivot the side arms about a common axis when they are attached to opposite

5   sides of the spa.  (Defs' Opp'n to Pl.'s Mot. for Summ. J. at 9.)  Coverplay acknowledges that

6   while the axes of the side arms may be similar, they are not the same.  (*Id*.)

7        This argument flies in the face of Coverplay's own assembly instructions.  Coverplay

8   instructs its customers to position the side arms on opposing sides of the spa, at the base,

9   approximately seven inches from the corner.  (*Id*.)  Although the distance from the corner is just

10   a suggestion, Coverplay's instructions do not indicate the possibility of positioning them at a

11   different distance on each side of the spa.  (*See id*.)  To the contrary, in a later version of the

12   instructions, applicable to the lifters with VersaMount assemblies, the instructions warn to

13   "mak[e] sure [the VersaMounts] are equa-distant from each corner."  (Tudor Decl. in Supp. of

14   Defs' Consol Mot. for Summ. J. Ex. 7.)  If the flanges or VersaMount assemblies are located

15   equidistant from each corner of the spa, the pivoting supports necessarily pivot about a common

16   axis.  (Nixon Decl. in Opp'n to Defs' Consol. Mot. for Summ. J. ("Nixon Decl.") at 2-3.)

17        Coverplay makes a number of factual arguments in a attempt to show that its products do

18   not have a pivot means which rotates the side arms about a common pivot axis.  First, Coverplay

19   contends that the Forward Fulcrum feature and the possible adjustment of the side arms' length

20   compensate for the lack of a common axis or alignment.  (*See* Tudor Decl. in Supp. of Defs'

21   Consol Mot. for Summ. J. at 3-4; Gupta Decl. in Supp. of Defs' Consol. Mot. for Summ. J. at 3

22   (length of each side arm can be adjusted by use of two horizontal bar assemblies).)  According to

23   Coverplay's expert Vijay Gupta, the purpose is to allow the user to attach the flange or

24   VersaMount assemblies either on the deck or directly on the opposite sides of the spa or a

25   combination thereof.  (Gupta Decl. in Supp. of Defs' Consol. Mot. for Summ. J. at 3.)  This

26   assertion is unsupported by the record.  According to Coverplay's inventor Jess Tudor and the

27   assembly instructions, the choice is for both assemblies to be attached on the side of the spa or

28   the deck, not on the deck on one side and on the side of the spa on the other side.  (*See* Tudor

1   Decl. in Supp. of Defs' Consol Mot. for Summ. J. at 3 & Ex. 7.)  Expert testimony unsupported

2   by sufficient facts or date is inadmissible and therefore cannot properly oppose a summary

3   judgment motion.  *See* Fed. R. Evid. 702 & Fed. R. Civ. P. 56(e).

4        Furthermore, Dr. Gupta asserts that Coverplay's products are "purposely designed to

5   operate with two independent pivot axes" and "allow proper rotation . . . with completely

6   misaligned pivoting axes of the two pending arms."  (Gupta Decl. in Supp. of Defs' Consol.

7   Mot. for Summ. J. at 3.)   Again, these assertions are unsupported and, again, they contradict

8   Coverplay's own assembly instructions.  Dr. Gupta had to acknowledge that the instructions

9   indicate to the installer to make sure that the VersaMounts are equidistant from each corner.

10  (Garner Decl. in Supp. of Pl.'s Mot. for Summ. J. Ex. I, Gupta Depo. ("Gupta Depo.") at 232;

11  *see also id.* at 143.)  Dr. Gupta's unsupported assertions cannot properly oppose a summary

12  judgment motion.  *See* Fed. R. Evid. 702 & Fed. R. Civ. P. 56(e).

13       The Forward Fulcrum feature referenced by Coverplay appears to concern the curved

14  nature of the side arms and the placement of the flange or VersaMount assemblies not at the

15  back corner of the spa but approximately seven inches forward from the back corner.  (Tudor

16  Decl. in Supp. of Defs' Consol Mot. for Summ. J. at 4 & Ex. 6.)  The bend in the side arms does

17  not affect the placement of the pivot axis.  (Garner Decl. in Opp'n to Defs' Consol. Mot. for

18  Summ. J. Ex. H, Delson Rebuttal Report ("Delson Rebuttal Report") at 2.)  Furthermore, the

19  location of the flange or VersaMount assemblies forward from the back corners of the spa also

20  does not affect the alignment of the two assemblies relative to each other so as to impact the

21  axis.

22       Second, Coverplay relies on the deposition testimony of Dimension One's expert Nathan

23  J. Delson, who testified that "[t]he orientation of the mounting plate on the elbow flange in the

24  Coverplay product relative to the pivot axis is different than on the pivot block of the '102

25  Patent."  (Grabell Decl. in Opp'n to Pl.'s Mot. for Summ. J. Ex. 3, Delson Depo. at 158.)

26  Neither the deposition excerpts nor Coverplay's briefs explain in any way this cryptic statement.

27  It appears that the statement does not address the alignment of the pivot axes as between the

28  pivot means, *i.e.*, flange or VersaMount assemblies, on each side of the spa, but to the alignment

1  of the parts within the same assembly.  The statement is therefore irrelevant to Coverplay'

2  common pivot axis argument.

3       Third, Coverplay argues that its products with the Forward Fulcrum feature do not work

4  with in-ground spas if the flange or VersaMount assemblies are moved too far forward.[3]  (Tudor

5  Decl. in Supp. of Defs' Consol Mot. for Summ. J. at 5; Defs' Opp'n to Pl.'s Mot. for Summ. J. at

6  10.)  Coverplay does not explain how the possibility of assembling its products so as to operate

7  improperly presents a defense to infringement.  The fact that Coverplay's products do not work

8  with in-ground spas when the pivot axes are moved too far forward does not shield Coverplay

9  from infringement.  Its products can be, and are instructed to be, assembled in a way that aligns

10  the pivot axes and assures proper functioning.  Coverplay's argument that its products do not

11  work with in-ground spas when the pivot axes are too far forward is irrelevant.  Its own evidence

12  shows that the pivot axes of its products can be sufficiently aligned to assure proper functioning,

13  and can even be perfectly aligned.  (Tudor Decl. in Supp. of Defs' Consol Mot. for Summ. J. Ex.

14  7 & Gupta Depo. at 143.)  The assembly instructions show that it is desirable for the proper

15  assembly to align the pivot axes, although it is not necessary for them to be aligned perfectly for

16  the cover lifter to operate properly.

17       According to Dr. Gupta, one of the reasons why the flange or VersaMount assemblies do

18  not have a common axis is that the installation instructions direct that the flange or VersaMount

19  assemblies on each side be located "approximately" seven inches from the back corner of the spa

20  and that the "true corner" of the spa is not defined because the spas allegedly have circular

21  corners.  (Gupta Depo. at 140-42.)  According to Dr. Gupta, this makes it "next to impossible" to

22  achieve a 100% accurate alignment without using sophisticated measuring equipment.  (*Id*. at

23  142.)  With sophisticated measuring equipment it is possible to perfectly align the axes.  (*Id*. at

24  143.)  Without the equipment, following the instructions to affix the flange or VersaMount

25

26      [3]    Coverplay relies on Dr. Delson's reports in support of this proposition.  (*See* Defs'
Opp'n to Pl.'s Mot. for Summ. J. at 10.)  Coverplay does not provide a page citation to Dr.

27  Delson's initial report and the court did not find a reference to this issue in the initial report.  In
his rebuttal report, Dr. Delson noted the problem of inoperability because of the cover and spa

28  interfering; however, his observation was not limited to in-ground spas but to any spa where the
pivot means are placed too far forward.  (Delson Rebuttal Report at 3.)

1   assemblies equidistant from the back true corners of the spa, the axes will "be off by a little bit."

2   (*Id*. at 142.)  Being off a little bit does not prevent the device from operating properly.  (Delson

3   Decl. in Opp'n to Defs' Consol. Mot. for Summ. J. ("Delson Decl.") at 7.)

4            Dr. Gupta contradicts his deposition testimony in that he states in his subsequent

5   declaration that the axis of one VersaMount or flange assembly "cannot be aligned with the

6   other."  (Gupta Decl. at 3.)  The court may strike and disregard tactical corrections or "rewrites"

7   of a deposition transcript "tailored to manufacture an issue of material fact . . . to avoid a

8   summary judgment ruling."  *Hambleton Bros. Lumber Co. v. Balkin Enter., Inc.*, 397 F.3d 1217,

9   1225 (9th Cir. 2005).  This is because "[a] deposition is not a take home examination."  *Id.*

10  (quoting *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n. 5 (10th Cir. 2002)).  The court

11  can strike all or a portion of an affidavit for purposes of opposing a summary judgment motion.

12  *See e.g., Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir.1991) ("a party cannot

13  create an issue of fact by an affidavit contradicting his prior deposition testimony"); *Block v.*

14  *City of Los Angeles*, 253 F.3d 410, 419 n.2 (9th Cir. 2001) ("A party cannot create a genuine

15  issue of material fact to survive summary judgment by contradicting his earlier version of the

16  facts."); *see also Hambleton Bros. Lumber Co.*, 397 F.3d at 1225.  The court therefore strikes the

17  assertion in Dr. Gupta's declaration that the axes cannot be aligned.

18            According to Dr. Delson, "[i]t is practically impossible to align two axes of a mechanical

19  device with absolute mathematical precision.  All mechanical devices have tolerances of

20  assembly which allow for proper function of the device with permissible misalignment."

21  (Delson Decl. at 6.)  It is undisputed that it is nearly impossible to assemble a cover lifter so as to

22  perfectly align the axes.  (*Id.*; Gupta Depo. at 142.)  Accepting Dr. Gupta's opinion that the '102

23  Patent requires perfect alignment of the pivot axes, would therefore, as a practical matter,

24  eliminate at least the embodiments of the '102 Patent which do not include a lower bridge arm.

25  (*See* Delson Decl. at 6.)  The embodiments of the '102 Patent, just like Coverplay's products,

26  operate properly even when the axes are "a little bit off." (*See id*. at 6-7 (The pivots "share the

27  pivot axis even when they are not perfectly aligned, unless the pivot points were significantly

28  misaligned to the degree where the mechanism would no longer function as designed.").

1    Based on the foregoing, Coverplay cannot raise a genuine issue of fact regarding the

2    alignment of the pivot axes of its products as compared to the '102 Patent.

3         At the summary judgment stage, facts must be viewed in the light most favorable
           to the nonmoving party only if there is a 'genuine' dispute as to those facts.  As we
4          have emphasized, '[w]hen the moving party has carried its burden under Rule
           56(c), its opponent must do more than simply show that there is some
5          metaphysical doubt as to the material facts . . ..  Where the record taken as a whole
           could not lead a rational trier of fact to find for the nonmoving party, there is no
6          genuine issue for trial.'  '[T]he mere existence of some alleged factual dispute
           between the parties will not defeat an otherwise properly supported motion for
7          summary judgment; the requirement is that there be no genuine issue of material
           fact.'  When opposing parties tell two different stories, one of which is blatantly
8          contradicted by the record, so that no reasonable jury could believe it, a court
           should not adopt that version of the facts for purposes of ruling on a motion for
9          summary judgment.

10   *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007), quoting *Matsushita*, 475 U.S. at 586-587 (footnote

11   omitted) & *Anderson*, 477 U.S. at 247-248 (1986).  As noted above, Dr. Gupta's opinions

12   regarding the purpose of the Forward Fulcrum design to accommodate "completely misaligned

13   pivoting axes" are plainly contradicted by the record.  Drawing all justifiable inferences in

14   Coverplay's favor, a reasonable jury could not believe that, as a factual matter, the requirements

15   for the proper operation of Coverplay's products and the products embodying the '102 Patent are

16   substantially different insofar as the alignment of the pivot axes is concerned.

17        Based on the foregoing, Coverplay's argument regarding the "common pivot axis"

18   limitation may have some merit only if it is correct in its premise that the term "common pivot

19   axis" as used in the '102 Patent means exactly co-axial or mathematically precise alignment.

20   (*See* Gupta Depo. at 142-43.)  Coverplay has provided no evidence in support of this

21   assumption.  Dr. Gupta argued that approximate alignment is not written in the claim language,

22   but "common pivot axis" was chosen instead.  (*Id*. at 143.)  On the other hand, the '102 Patent

23   does not teach the necessity of mathematically precise alignment.  (Garner Decl. in Supp. of Pl.'s

24   Mot. for Summ. J. Ex. A; Nixon Decl. at 2-3, 4.)

25        For the first time in its reply brief, Coverplay articulates a legal argument why the term

26   "common pivot axis" should be construed as understood by a person of ordinary skill in the art

27   at the time of the invention.  (*See* Defs' Reply in Supp. of Consol. Mot. for Summ. J. at 1-4.)

28   Although Coverplay does not state what that definition is, presumably it is aiming for the

03cv1099

1   definition advocated by Dr. Gupta – a precise alignment that can only be achieved with the use
2   of sophisticated measuring equipment.  Coverplay does not reference any evidence to show what
3   meaning the term would have to a person of ordinary skill in the art.  (*See id.*)  Furthermore,
4   because Coverplay raised this legal theory for the first time in its reply, Dimension One did not
5   have an opportunity to respond.  Parties should not raise new issues for the first time in their
6   reply briefs.  *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).

7           To find that the accused devices meet the pivot means limitation under § 112, ¶ 6, "the
8   court must compare the accused structure *with the disclosed structure*, and must find equivalent
9   *structure* as well as *identity* of claimed *function* for the structure."  *Frank's Casing*, 389 F.3d at
10  1378 (internal quotation marks and citations omitted, emphases in original).  Because the
11  meaning of the term "common pivot axis" is disputed, the court is not in the position to perform
12  this analysis and determine whether the accused devices meet this element of the pivot means
13  limitation.  As more specifically ordered below, the parties shall provide supplemental briefing
14  on this issue before trial.

15  **Upper Bridge Arm**

16          Coverplay argues that its CoverPro products do not infringe the "upper bridge arm"
17  limitation of the '102 Patent.  The "upper bridge arm" is construed as "external to the spa
18  cover."  (Claim Construction Order at 35.)  Coverplay argues that the CoverPro does not have an
19  external upper bridge arm.

20          When Coverplay's horizontal bars are attached to the spreader bar, the assembly
21  corresponds to the upper bridge arm of the '102 Patent.  (Tudor Decl. in Supp. of Defs' Consol
22  Mot. for Summ. J. at 3-4 & Ex. 7 *cf*. Garner Decl. in Supp. of Pl.'s Mot. for Summ. J. Ex. A at
23  Fig. 1.)  "For the CoverPro product, the horizontal bar attaches to the side of the spa cover. . . .
24  The spa cover is fitted internally with a tube hinge.  There is no external cross member or arm
25  that extends across the top of the spa cover."  (Tudor Decl. in Supp. of Defs' Consol Mot. for
26  Summ. J. at 4 & Ex. 10.)

27          In opposition, Dimension One argues that the court does not have jurisdiction to rule on
28  infringement by the CoverPro product because this product has not been accused of

1  infringement.  (Pl.'s Opp'n to Defs' Consol. Mot. for Summ. J. at 16-17.)   Specifically, it argues

2  that CoverPro is not a part of this case because the case was filed in 2003, but CoverPro was not

3  offered for sale until 2005.  *See Lang v. Pac. Marine and Supply Co., Ltd.*, 895 F.2d 761, 764-65

4  (Fed. Cir. 1990) (where the accused product was not finished until after the complaint was filed,

5  the case lacked the actual controversy requirement of standing).

6        This action was commenced on June 2, 2003.  The CoverPro products were offered for

7  sale in advertisements beginning June 2005.  (Defs' Reply in Supp. of Consol. Mot. for Summ.

8  J. at 7.)  On February 17, 2006, Dimension One filed its second amended complaint.

9        In the second amended complaint, Dimension One accused Coverplay's "spa cover lifts,

10  including several models of spa cover lift devices known variously as the 'CoverUp' spa cover

11  lift and the "Forward Fulcrum" spa cover lift, that embody the patented invention."  (Second

12  Am. Compl. at 4.)  The CoverPro product includes the Forward Fulcrum design.  (Tudor Decl. in

13  Supp. of Defs' Consol Mot. for Summ. J. at 4.)  Although Dimension One does not refer to

14  CoverPro by name in its first cause of action for infringement, it refers to it by name in its

15  second cause of action for unfair competition.  (*Id*. at 6.)  Furthermore, the CoverPro product is

16  included in Coverplay's counterclaim filed June 2, 2006, which seeks a declaratory judgment of

17  non-infringement as to all of its products, including the CoverPro.  (Answer to Sec. Am. Compl.

18  and Countercl. at 12, 13 & 16.)  Therefore there is an actual controversy involving the CoverPro

19  products and the court has jurisdiction to address the issue, either in the context of Dimension's

20  One's claim for infringement or Coverplay's claim for a declaration of non-infringement.

21        Nevertheless, the court has discretion to decline to exercise jurisdiction.  "[T]he district

22  court is given the discretion, in declaratory judgment actions, to dismiss the case."  *SanDisk*

23  *Corp. v. STMicroelec., Inc.*, 480 F.3d 1372, 1383 (Fed. Cir. 2007) (internal quotation marks and

24  citations omitted).  "[T]here are boundaries to that discretion.  When there is an actual

25  controversy and a declaratory judgment would settle the legal relations in dispute and afford

26  relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not

27  subject to dismissal.  Furthermore, the exercise of discretion must be supported by a sound basis

28  for refusing to adjudicate an actual controversy."  *Id*.

03cv1099

Dimension One contends that discovery, including expert discovery, has not been taken regarding the design and features of the CoverPro.  (Pl.'s Opp'n to Defs' Consol. Mot. for Summ. J. at 16.)  On the other hand, Coverplay asserts that discovery has been taken.  (Defs' Reply in Supp. of Mot. for Summ. J. at 7.)  Neither party offers any affidavits or exhibits in support of their statements that discovery either has or has not been taken regarding the CoverPro products.  Dimension One has not made a request under Rule 56(f) for time to conduct the relevant discovery.

Because CoverPro is a Forward Fulcrum product, it is apparent that there would be substantial inefficiencies if the court adjudicated the infringement issues pertaining to all the accused products except for the CoverPro products.  Based on the foregoing, Dimension One's request that the court decline to decide the infringement claims pertaining to the CoverPro products is denied.

Coverplay has satisfied its burden as the moving party with regard to its own claim for declaration of non-infringement.  The burden therefore shifts to Dimension One to show summary adjudication is not appropriate.  *See Celotex,* 477 U.S. at 317, 324.  The nonmovant must go beyond the pleadings to designate specific facts showing there are genuine factual issues which "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.  Aside from jurisdiction, Dimension One does not offer any other argument or evidence in opposition to Coverplay's motion regarding the upper bridge arm limitation.

Dimension One has not met its burden to overcome Coverplay's motion for summary adjudication of the issue whether CoverPro infringes the "upper bridge arm" limitation.  The court therefore finds that there is no genuine issue of fact whether Coverplay's CoverPro products meet the "upper bridge arm" limitation of the '102 Patent.  Because the CoverPro products do not meet each limitation of Claim 1, they do not literally infringe on the '102 Patent.

Coverplay also argues that the CoverPro products also do not infringe under the doctrine of equivalents.  (Defs' Consol. Mot. for Summ. J. at 17-18.)  The argument is based on the prosecution history of the '102 Patent.  In the Second Notice of Allowability, the Examiner

1   distinguished Dimension One's application from the Wall Patent by pointing out that the Wall

2   Patent alone or in combination with prior art did not include a bridge member such that the cover

3   is folded over the bridge arm.  (Claim Construction Order at 34-35, citing '102 Patent file

4   wrapper at DIMI 0000067.)  Coverplay argues that this prosecution history bars a finding of

5   equivalents with respect to the upper bridge arm.

6       The most common application of the prosecution history estoppel is when a patent claim

7   is narrowed to avoid prior art and thus ensure patentability.  *Festo Corp v. Shoketsu Kinzoku*

8   *Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 735 (2002).  This is what happened during the

9   prosecution of the '102 Patent.  The patent examiner relied on the upper bridge arm difference

10  between the Wall Patent and the '102 Patent application.  Because the distinction was made for

11  reasons of patentability, the question is not whether estoppel applies but what is the scope of the

12  equivalents it bars.  *See id.* at 741.

13      Coverplay has met its burden on summary judgment by presenting evidence to show that

14  CoverPro does not infringe under the doctrine of equivalents.  Dimension One, as the patentee,

15  bears the burden of showing that a particular equivalent is not barred.  *Id.* at 740.  It has not cited

16  any evidence or made any arguments why CoverPro's horizontal bar is not one of the

17  equivalents barred by the prosecution history estoppel.  Accordingly, there is no genuine issue of

18  material fact whether CoverPro infringes the '102 Patent under the doctrine of equivalents.

19  **COVERPLAY'S ALTERNATIVE MOTION FOR A DECLARATION OF INVALIDITY**

20      Coverplay argues that if the court does not accept its proposed claim construction of

21  equivalent structure of the pivot means, then the '102 Patent is invalid as a matter of law.  (Defs'

22  Consol. Mot. for Summ. J. at 19.)  A patent is presumed valid.  *Invitrogen Corp. v. Biocrest*

23  *Mfg., L.P.*, 424 F.3d 1374, 1378 (Fed. Cir. 2005).  To overcome the presumption requires proof

24  by clear and convincing evidence.  *Id.*  The same standard of proof applies in the context of

25  summary judgment.  *Id.*

26  / / / / /

27  / / / / /

28  / / / / /

16                                                      03cv1099

1    Specifically, Coverplay maintains, based entirely on James Campbell's and Philip

2    Salley's trial[4] testimony, that the '102 Patent was obvious in light of the Wall Patent and its

3    embodiment, the Starlight Lifting Device.[5]   Coverplay's argument is based on excerpts from two

4    days of trial testimony (Defs' Consol. Mot. for Summ. J. at 18-19), and its interpretation of this

5    testimony is contrary to the Findings of Fact and Conclusions of Law.   Accordingly, Coverplay

6    failed to meet its burden as the moving party.   Its motion for summary adjudication of its

7    invalidity claim is therefore denied.

8    **DIMENSION ONE'S MOTION TO STRIKE**

9    Dimension One filed a motion to strike Dr. Gupta's declaration because it untimely

10   disclosed his opinion that the '102 Patent is invalid in view of prior art.   This opinion was not

11   included in his timely expert report.   At deposition, Dr. Gupta testified he had no opinion

12   regarding this issue and did not intend to offer one, but reserved the "right" to offer an opinion

13   later.   (Garner Decl. in Supp. of Mot to Strike Ex. C, Gupta Depo. ("Gupta Depo.") at 107-08.)

14   If the court were inclined to permit Dr. Gupta's untimely invalidity opinions, Dimension One

15   would request an opportunity to depose him on his new opinions and seek leave for its own

16   experts to offer rebuttal opinions.

17   Coverplay argues that at the close of expert discovery the parties had not received the

18   claim construction order and Dr. Gupta therefore was not in a position to opine about patent

19   validity.   It characterizes the declaration as a "supplemental confirmatory opinion."

20   Under Federal Rule of Civil Procedure 26(a)(2)(b), expert reports must contain "a

21   complete statement of opinions the witness will express . . .."   "A party must make these

22   disclosures at the times and in the sequence that the court orders."   Fed. R. Civ. Proc.

23   26(a)(2)(C).   Coverplay does not deny that it has not sought leave to extend the expert discovery

24   dates to allow for Dr. Gupta's invalidity opinions.

25   / / / / /

26   

27   [4]      Testimony given in this case at bench trial regarding Coverplay's inequitable conduct defense on April 24 and 25, 2007.

28   [5]      For a description and discussion of the Wall Patent and the Starlight device, see Findings of Fact and Conclusions of law filed Sep. 25, 2007.)

With respect to supplemental reports, Rule 26(e) provides in pertinent part:

> A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response [] in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . ..

Because Dr. Gupta did not opine and did not indicate that he intended to opine about patent validity in his initial report, his subsequent invalidity report cannot be supplemental to the initial report.  Furthermore, Coverplay does not claim that the initial report was in some way incomplete or incorrect.

Exclusion of evidence is an appropriate sanction for a party who fails to comply with Rule 26(a):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. Proc. 37(c).  "Courts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded."  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  Exclusion is an appropriate remedy even when the litigant did not violate an explicit court order and even absent a showing of bad faith or willfulness.  *Id*. at 1106.  "Two express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless."  *Id*.

Coverplay's explanation that the parties had not yet received the claim construction order does not amount to substantial justification.  Prior to receiving the order, Dr. Gupta offered his opinions about infringement, an issue which is as impacted by claim construction as validity.  Dr. Gupta analyzed infringement based on the parties' proposed claim construction.  The reason he did not do the same with his invalidity opinions is, as he testified in deposition, that Coverplay had not asked him to.  (Gupta Depo. at 110.)  The proper procedure under the circumstances was for Coverplay to either request an extension of the discovery deadlines, or timely issue an preliminary invalidity report to be supplemented after the claim construction

1    order issued.  *See Yeti by Molly*, 259 F.3d at 1106.  Dr. Gupta's unilateral reservation of rights at

2    his deposition does not cure Coverplay's failure to follow either of these options.  Accordingly,

3    Coverplay has not presented a substantial justification for its failure to timely disclose Dr.

4    Gupta's invalidity opinions.

5          Furthermore, Coverplay has not met its burden to show harmlessness.  "[T]he burden is

6    on the party facing sanctions to prove harmlessness."  *Yeti by Molly*, 259 F.3d at 1107.

7    Coverplay does not contend that the untimeliness of Dr. Gupta's invalidity opinion is harmless.

8          Based on the foregoing, Dimension One's motion to strike is granted.  The court will not

9    consider Dr. Gupta's invalidity opinions.  Paragraphs 16 and 17 and Exhibit 3 of Declaration of

10   Vijay Gupta in Support of Coverplay Inc.'s Consolidated Motion for Summary Judgment of

11   Non-Infringement or, if Denied, for Invalidity, Pursuant to Federal Rule of Civil Procedure

12   56(c), dated November 16 [*sici*], and Declaration of Dr. Vijay Gupta in Support of Coverplay

13   Inc.'s Opposition to Dimension One Spa's Motion for Summary Judgment That Defendants'

14   Accused Products Literally Infringe the Patent in Suit, dated December 3 [*sic*], are hereby

15   stricken.

16   **DIMENSION ONE'S MOTION REGARDING LACHES AND EQUITABLE ESTOPPEL**

17         Dimension One moved for partial summary judgment against Coverplay on its laches and

18   equitable estoppel defenses.  Both are defenses to patent infringement.  *A.C. Aukerman Co. v.*

19   *R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (*en banc*).

20         Laches has two elements:  "(a) the patentee's delay in bringing suit was unreasonable and

21   inexcusable, and (b) the alleged infringer suffered material prejudice attributable to the delay."

22   *Id*.  Equitable estoppel has three elements: "a.  The patentee, through misleading conduct, leads

23   the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent

24   against the alleged infringer. . . . [¶] b.  The alleged infringer relies on that conduct.  [¶]  c.  Due

25   to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to

26   proceed with its claim."  *Id*.  Accordingly, both defenses require a showing of prejudice.

27         Dimension One argues that Coverplay cannot show any prejudice from the delay in filing

28   this case.  With regard to both defenses, prejudice can be economic or evidentiary.  *Aukerman*,

960 F.2d at 1033, 1043.  Dimension One maintains that Coverplay cannot show economic

prejudice because it was aware of Dimension One's pursuit of infringement claims against others

during the relevant time (*see* Garner Decl. in Supp. of Mot. for Partial Summ. J. Ex. D, Tudor

Depo. at 38), yet continued to produce the accused products, developed additional allegedly

infringing models, and expanded its market (*see, e.g., id.* at 95-96, 170-73, 228-41).  Coverplay

did not believe that its products infringed the '102 Patent.  (Garner Reply Decl. in Supp. of Pl.'s

Mot. for Partial Summ. J., Ex. A, Tudor Depo. at 149-50, 155-56.)  Moreover, Coverplay did not

change its conduct after the commencement of this action.  (Garner Decl. in Supp. of Mot. for

Partial Summ. J. Ex. F.)  After service of process, Coverplay obtained an opinion letter regarding

non-infringement and invalidity of the '102 Patent.  (Garner Reply Decl. in Supp. of Pl.'s Mot.

for Partial Summ. J., Ex. A, Tudor Depo. at 219.)  In addition, Coverplay allegedly cannot show

evidentiary prejudice because it has been able to mount its defense on the merits of the

infringement claims.  Based on the foregoing, Dimension One claims both defenses should be

summarily adjudicated against Coverplay.

　　　　Coverplay's evidence shows that on December 4, 1996, it sent a letter to Dimension One,

enclosing a drawing of its product, stating that it will be introducing its spa cover lifter at the

January 1997 trade show in Las Vegas, and inquiring whether Dimension One would distribute

it.  (Grabell Decl. in Opp'n to Pl.'s Mot. for Partial Summ. J., Ex. 1.)  Coverplay displayed a

prototype of the CoverUp product at the January 1997 show.  (Tudor Decl. in Opp'n to Pl.'s

Mot. for Partial Summ. J. at 2.)  It again displayed its products at the January 1998 show.  (*Id.*)

At that time, Mr. Tudor learned that other exhibitors received cease and desist letters from Mr.

Salley of Dimension One based on infringement, but Coverplay did not receive such a letter.

(*Id.* at 2-3)  At the same show, Mr. Salley, the inventor of the '102 Patent, visited Coverplay's

booth and stated that Coverplay did not infringe Dimension One's patent.  (*Id.*)  Coverplay

continued to exhibit at the show annually until 2003, but did not receive any cease and desist

letters from Dimension One.  (*Id.* at 3.)  Based on the foregoing experience and based on his

product designs, Mr. Tudor believed Coverplay did not infringe on the '102 Patent.  (*Id.*)

"Based on this belief, [Mr. Tudor] devoted substantial time and monetary resources improving

1  [his] products and developing new products, expanding [his] manufacturing and sales operations,

2  purchasing and moving into a new building, and otherwise expanding the Coverplay business."

3  (*Id*.)  The first notice Coverplay received from Dimension One regarding infringement was when

4  Mr. Tudor was served with process in this case in July 2003.  (*Id*. at 4.)

5       Coverplay argues that the defense of laches is presumed because Dimension One waited

6  more than six years to bring suit.

> [A] *prima facie* defense of laches is made out upon proof that by the accused
> infringer that the patentee delayed filing suit for six years after actual or
> constructive knowledge of the defendant's acts of alleged infringement.  Without
> the presumption, the two facts of unreasonable delay and prejudice might
> reasonably be inferred from the length of the delay, but not necessarily.  With the
> presumption, these facts *must* be inferred, absent rebuttal evidence.

11 *Aukerman*, 960 F.2d at 1037 (emphasis in original).  No corresponding presumption applies to

12 equitable estoppel.  *Id*. at 1043.

13      Dimension One does not deny that it waited more than six years.  The defense of laches is

14 therefore established, absent rebuttal evidence.  "A patentee may . . . eliminate the presumption

15 with an offer of evidence sufficient to place the matters of defense prejudice and economic

16 prejudice genuinely in issue."  *Id*. at 1038.  "By raising a genuine issue respecting either factual

17 element of a laches defense, the presumption of laches is overcome."  *Id*.  "Elimination of the

18 presumption does not mean the patentee precludes the possibility of a laches defense; it does

19 mean, however, that the presumption of laches plays no role in the ultimate decision.  The facts

20 of unreasonable delay and prejudice then must be proved and judged on the totality of the

21 evidence presented."  *Id*.

22      Dimension One disputes that Coverplay suffered either evidentiary or economic

23 prejudice.  "Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to

24 present a full and fair defense on the merits due to loss of records, the death of a witness, or the

25 unreliability of memories of long past events, thereby undermining the court's ability to judge

26 the facts."  *Id*. at 1033.

27      Coverplay claims that it suffered evidentiary prejudice because it is no longer possible to

28 verify exactly who at Dimension One attended the January 1997 trade show.  (Defs' Opp'n to

1    Pl's Mot. for Partial Summ. J. at 5; Grabell Decl. in Opp'n to Pl.'s Mot. for Partial Summ. J., Ex.

2    10, Decl. of Stan Chambers at 2.)  Coverplay does not explain why the evidence of who exactly

3    from Dimension One attended the 1997 show is relevant.  Although the missing evidence

4    appears to be relevant to bolster the laches and estoppel defense, it is not relevant to the merits.

5    Coverplay's argument therefore boils down to bootstrapping – it should be allowed to present

6    the laches and estoppel defenses because it was prejudiced by missing evidence in support of

7    these defenses.  Aside from the circular aspect, even if Coverplay's evidence were sufficient to

8    support a showing of evidentiary prejudice, the prejudice is not material because Coverplay has

9    evidence that Dimension One's employees attended the 1997 show.  (*See* Chambers Decl. at 2.)

10   Without more, the additional evidence of the names of the attendees is irrelevant.

11          Accordingly, Coverplay cannot make a showing of evidentiary prejudice in support of its

12   equitable estoppel defense.  With respect to laches, the presumption shifts the burden of

13   production, but does not shift the ultimate burden of persuasion.  *Aukerman*, 960 F.2d at 1037.

14   Notwithstanding the presumption, Coverplay as "the defendant bears the ultimate burden of

15   persuasion of the affirmative defense of laches."  *Id.* at 1038.  In light of Coverplay's theory of

16   evidentiary prejudice, there is no "genuine" dispute.  *See Scott*, 127 S. Ct. at 1776.

17          With respect to the economic prejudice, Dimension One contends that the delay did not

18   cause Coverplay to change its business activity and that its pursuit of a larger market share and

19   higher profit during the delay is insufficient as a matter of law to show prejudice.

20          Economic prejudice may arise where a defendant . . . will suffer the loss of
       monetary investments or incur damages which likely would have been prevented
21     by earlier suit.  Such damages or monetary losses are not merely those attributable
       to finding of liability for infringement.  Economic prejudice would then arise in
22     every suit.  The courts must look for a *change* in the economic position of the
       alleged infringer during the period of delay.  On the other hand, this does not mean
23     that a patentee may intentionally lie silently in wait watching damages escalate,
       particularly where the infringer, if he had no notice, could have switched to a
24     noninfringing product.  Indeed, economic prejudice is not a simple concept but
       rather is likely to be a slippery issue to resolve.
25

26   *Aukerman*, 960 F.2d at 1033 (internal citations omitted).  These principles were applied in

27   *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001), and *State Contracting and*

28   *Engineering Corp. v. Condotte America, Inc.*, 346 F.3d 1057 (Fed. Cir. 2003).  In *State*

1   *Contracting*, the court construed economic prejudice as follows:  "A nexus must be shown

2   between the patentee's delay in filing suit and the expenditures; the alleged infringer must

3   change his position because of and as a result of the delay."  346 F.3d at 1066 (internal quotation

4   marks and citations omitted).  The defendant claimed it was prejudiced by the delay because it

5   continued to incorporate the invention into bids and contracts, and would have avoided

6   infringement by using a previous design.  *Id*.  The defense was rejected first because the alleged

7   economic prejudice was limited to the amount of the infringement liability and was therefore

8   insufficient.  *Id*.  Second, the defendant failed to establish a nexus between the delay and the

9   alleged economic injury because it failed to show that an earlier filing would have caused it to

10  change its behavior or avoid incurring certain expenses.  *Id*. at 1066-67.

11      As in this case, the defendant in *Ecolab* sent a letter to the plaintiff indicating it intended

12  to begin distribution of its new product.  264 F.3d at 1362.  No response was received.  *Id*.

13  Subsequently, the defendant hired new employees, modified its equipment, and engaged in sales

14  and marketing related to the new product.  *Id*. at 1371.  The trial court construed economic

15  prejudice as "a change in the economic position of [the defendant] during the period of delay

16  that would not have occurred had [the plaintiff] sued earlier."  *Id*.  It found that the defendant's

17  alleged economic prejudice was "damages normally associated with a finding of infringement

18  [which did] not constitute the type of damages necessary for a finding of economic prejudice."

19  *Id*. at 1371-72.  Furthermore, the defendant's "firm belief from the outset that its product was

20  noninfringing, coupled with its conduct after being contacted by [the plaintiff], led the court to

21  the conclusion that the foregoing economic decisions were merely business decisions to

22  capitalize on a market opportunity."  *Id*. at 1372.  The trial court's decision on summary

23  judgment that the defendant could not establish either laches or estoppel was affirmed.  *Id*. at

24  1361.

25      Coverplay's theory of economic damage is the same as in *Ecolab* and *State Contracting*.

26  Coverplay invested in developing and marketing its product at least in part because of its belief

27  that its products did not infringe (Tudor Decl. in Opp'n to Pl.'s Mot. for Partial Summ. J. at 2),

28  and did not change its business course after it was notified of Dimension One's position (Garner

1  Decl. in Supp. of Mot. for Partial Summ. J. Ex. F).  In response, Coverplay does not argue and

2  offers no evidence that it would have acted differently had Dimension One filed its lawsuit

3  earlier.

4     Dimension One's evidence is sufficient to rebut the presumption of laches.  *See*

5  *Aukerman*, 960 F.2d at 1038.  In the absence of the presumption of laches, Coverplay's evidence

6  is insufficient to support a showing of economic prejudice with respect to either laches or

7  equitable estoppel.  Based on the foregoing, Dimension One's motion for partial summary

8  judgment with respect to Coverplay's defenses of laches and equitable estoppel is granted.

9  **COVERPLAY'S MOTION REGARDING PREEMPTION OF STATE LAW CLAIMS**

10    Coverplay filed a motion for summary adjudication arguing that Dimension One's state

11  law claims should be dismissed based on preemption.  In addition to its infringement claim,

12  Dimension One asserts state law claims for unfair competition under statutory and common law,

13  intentional interference with contract and intentional interference with prospective economic

14  relations.  (*See* Second Am. Compl. at 5-11.)  All four causes of action are based on the premise

15  that Coverplay's U.S. Patent No. 5,974,599 (the '599 Patent") is invalid, and that Coverplay

16  knowingly promoted an invalid patent so as to unfairly compete and interfere with Dimension

17  One's business of licensing the '102 Patent.  (*Id.*)

18    A patentee has a right to inform others of its patent rights.  *GP Indus., Inc. v. Eran Indus.,*

19  *Inc.*, 500 F.3d 1369, 1374 (Fed. Cir. 2007), citing 35 U.S.C. § 287.  When state law claims are

20  based on such communications, federal law governs the appropriateness of the communications

21  unless the communications were made in bad faith.  *Id.*  "[T]o avoid preemption, bad faith must

22  be alleged and ultimately proven, even if bad faith is not otherwise an element of the [state] tort

23  claim."  *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1374 (Fed.

24  Cir. 2004).  "[A] patentee acting in good faith on its belief as to the nature and scope of its rights

25  is fully permitted to press those rights even though he may misconceive what those rights are."

26  *GP Indus.*, 500 F.3d at 1374  Coverplay's motion is based on the  argument that Dimension One

27  cannot present any evidence of Mr. Tudor's bad faith.

28  / / / / /

1    "'[B]ad faith' may include subjective and objective considerations;" however, "a bad

2    faith standard cannot be satisfied in the absence of a showing that the claims asserted were

3    objectively baseless." *Id.* "Subjective considerations of bad faith are irrelevant if the assertions

4    are not objectively baseless." *Id.* at 1375; *see also Globetrotter Software*, 362 F.3d at 1375. The

5    issue whether a defendant's actions giving rise to the state law claims were objectively baseless

6    is appropriate for resolution on summary judgment. *See Globetrotter Software*,, 362 F.3d at

7    1368. The "objectively baseless" standard can be satisfied by showing that the defendant's

8    patent rights at issue in the communication "were obviously invalid or plainly not infringed." *Id.*

9    at 1375.

10   Dimension One's legal theory underlying the state law claims is that Coverplay's claims

11   regarding its rights under the '599 Patent were objectively baseless because the patent was

12   clearly invalid. (*See*, *e.g.,* Second Am. Compl. at 5-6.) Dimension One argues that the '599

13   Patent is invalid under 35 U.S.C. § 102(b) because it was marketed more than a year prior to

14   filing the patent application. (Pl.'s Opp'n to Defs' Mot. for Summ. J. at 5.) Dimension One

15   intends to show that the invalidity of the '599 Patent was so obvious that Mr. Tudor's knowledge

16   of the invalidity when he made the allegedly tortious statements could be inferred.

17   Coverplay argues that this is insufficient. It maintains that Dimension One cannot show

18   that the '599 Patent is invalid because the prototype was merely visually displayed. (Reply in

19   Supp. of Mot. for Summ. J. at 3.)

20   A person shall be entitled to a patent unless--
     . . .
21   (b) the invention was . . . in public use or on sale in this country, more than one
     year prior to the date of the application for patent in the United States, . . . .
22

23   35 U.S.C. § 102(b). Coverplay applied for the '599 patent on January 9, 1998. (Esty Decl. in

24   Supp. of Mot. for Summ. J. Ex. 1, the '599 Patent.) Accordingly, the critical date for purposes

25   of the invalidity analysis is January 9, 1997. *See Pfaff v. Wells Elec., Inc.*, 525 U.S. 55, 57

26   (1998). If Coverplay's invention was in public use or on sale before January 9, 1997, the '599

27   Patent is invalid under 35 U.S.C. § 102(b). The determination when an invention was "in public

28   / / / / /

25

use or on sale" is fact specific.  *See, e.g., id.*; *Invitrogen,* 424 F.3d 1374; *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1385 (Fed. Cir. 2007).

In *Pfaff*, the inventor was contacted by a customer to develop a new device.  525 U.S. at 58.  He showed the drawings to the customer, who then provided a confirmation of the previous purchase order.  *Id*.  The inventor then prepared detailed engineering drawings and sent them to a manufacturer.  *Id*.  As of the "critical date," the inventor had a confirmed purchase order and the manufacturer was making the devices to fulfill it.  *Id*.  The order was fulfilled and the device was reduced to practice after the critical date.  *Id*.  The court held that the patent was invalid under section 102(b), because the invention was on sale more than one year prior to the patent application.  *Id*. at 68-69.

In *Invitrogen*, the plaintiff used the process in its own laboratories before the critical date on a confidential basis to further other projects within the company.  424 F.3d at 1379, 1380.  It did not sell the process or any products made with it.  *Id*. at 1379, 1380.  The process was known only within the company.  *Id*. at 1379, 1380.  The court concluded that "[t]he fact that [the plaintiff] secretly used the [process] internally to develop future products that were never sold, without more, is insufficient to create public use bar to patentability."  *Id*. at 1383; *see also* at 1380.

In *Motionless Keyboard*, before the critical date, the inventor developed a model keyboard and then entered into a business partnership to gain financial support to further develop the technology.  486 F.3d at 1378-79.  The inventor then began to demonstrate the model to potential investors and one friend, some of whom were made to sign non-disclosure agreements.  *Id*. at 1379.  Some of the agreements expired before the critical date.  *Id*. at 1379.  The inventor also disclosed the model to a person to conduct typing tests before the critical date.  *Id*.  The court found it significant that in all instances except for the typist, the keyboard was not connected to a computer or any other device and therefore was not used for its intended purpose.  *Id*. at 1385.  "All disclosures, except for the one-time typing test, only provided a visual view of the new keyboard design without any disclosure of the [model's] ability translate finger movements into actuation of keys to transmit data."  *Id*.  Only the typist used the invention as

1   intended, *i.e.*, to transmit data to a computer.  *Id.* at 1379, 1385.  The typist executed a non-

2   disclosure agreement ("NDA") and performed the test before the critical date.  *Id.* at 1385.

3   Because the entry of data occurred only for testing purposes and under an NDA, the court found

4   that the patent was valid.  *Id.*

5          In this case, Mr. Tudor was done with the design phase of his spa cover lift in 1996 and

6   was ready to promote it at the end of 1996.  (Esty Decl. in Supp. of Defs' Mot. for Summ. J. Ex.

7   3, Tudor Depo. at 178-79.)  He constructed a large prototype of the cover lift, which was

8   functionally and structurally the same as the drawings for the '599 Patent.  (*Id.* at 63, 70-71.)

9   Although he did not install it on a spa, he knew that it would work.  (*Id.* at 179.)  He showed the

10  prototype to approximately ten of his friends as a new product.  (*Id.* at 61-63; Garner Decl. in

11  Opp'n to Defs' Mot. for Summ. J. Ex. A, Tudor Depo. at. 71-72.)  He did not request

12  confidentiality agreements from them and did not ask them to keep the invention a secret.

13  (Garner Decl. in Opp'n to Defs' Mot. for Summ. J. Ex. A, Tudor Depo. at 72; *see also* Esty

14  Reply Decl. in Supp. of Defs' Mot. for Summ. J. Ex. 4, Tudor Depo. at 181-82.)  Mr. Tudor's

15  purpose was for Coverplay to manufacture and sell the invention. (Garner Decl. in Opp'n to

16  Defs' Mot. for Summ. J. Ex. A, Tudor Depo. at 73.)

17         In addition, Coverplay promoted Mr. Tudor's invention in the December 4, 1996 letter to

18  Dimension One.  Coverplay contacted Dimension One as a competitor. (Garner Decl. in Opp'n

19  to Defs' Mot. for Summ. J. Ex. B.)  The letter referenced a conversation from a previous day.

20  (*Id.*)  It described in detail, and included a drawing of, the cover lift.  (*Id.*)  The letter emphasized

21  the benefits and attractive features of the cover lift, and expressed hope that Dimension One

22  would distribute it to its dealers.  (*Id.*)  Although it did not expressly state the price, it promised

23  that "[d]ealer profitability is ensured with one of the lowest price points in the industry."  (*Id.*)

24         In the letter, Coverplay indicated it would attend the January 1997 trade show.  (*Id.*)

25  Coverplay, including Mr. Tudor, attended the show from January 20 to 22, 1997.  (Tudor Decl.

26  in Opp'n to Pl.'s Mot. for Partial Summ. J. Re: Laches and Estoppel at 2.)  Coverplay had a

27  booth and exhibited a prototype of its cover lifter at the show.  (*Id.* at 2 & Ex. A.)  The show,

28  however, was after the January 9, 1997 critical date.

1    The legal standard for patent invalidity under section 102(b) "on sale" prong was

2    articulated in *Pfaff*. *Invitrogen*, 424 F.3d at 1379.  Two conditions must be present before the

3    critical date for the patent to be invalid:  "First, the product must be the subject of a commercial

4    offer for sale. . . . Second, the invention must be ready for patenting."  *Pfaff*, 525 U.S. at 67.

5    The test for invalidity under the "public use" prong must satisfy the inquiry whether the

6    invention was ready for patenting and "(1) was accessible to the public; or (2) was commercially

7    exploited."  *Invitrogen*, 424 F.3d at 1379-80.  Commercial marketing of an invention may meet

8    the "in public use or on sale" requirement even if it has not been assembled, adjusted and used.

9    *Id*. at 57 & n.1, 68.

10    There is sufficient evidence to raise a genuine issue whether the invention was accessible

11    to the public in 1996.  Mr. Tudor testified that he showed the prototype to several people without

12    any promise of confidentiality.  "[T]o qualify as 'public,' a use must occur without any

13    limitation or restriction, or injunction of secrecy."  *Invitrogen*, 424 F.3d at 1381 (internal

14    quotation marks and citation omitted).

15    Furthermore, although the evidence presented does not suggest that Mr. Tudor's

16    invention was "the subject of a commercial offer for sale," there is sufficient evidence to raise a

17    genuine issue whether the invention was commercially exploited, because Coverplay actively

18    solicited distributors with its December 4, 1996 letter and assured "dealer profitability."

19    Last, there is sufficient evidence to raise a genuine issue whether the invention was ready

20    for patenting.  This condition may be satisfied "by proof that prior to the critical date the

21    inventor had prepared drawings or other descriptions of the invention that were sufficiently

22    specific to enable a person skilled in the art to practice the invention."  *Pfaff*, 525 U.S. at 67-68.

23    Mr. Tudor not only prepared at least one drawing, he assembled a prototype.  The drawing

24    included in the December 4, 1996 letter (*see* Grabell Decl. in Opp'n to Pl.'s Mot. for Partial

25    Summ. J. Re: Laches and Estoppel Ex. 1) is clear and very similar to Fig. 3 of the '599 Patent

26    (*cf*. Esty Decl. in Supp. of Defs' Mot. for Summ. J. Ex. A).  Mr. Tudor testified that the

27    prototype he showed his friends was large and functionally and structurally the same as the

28    drawings in the '599 Patent.

Based on the foregoing, Dimension One has raised a genuine issue of fact whether the '599 Patent is valid.  The fact is material because invalidity is the basis for Dimension One's intended showing that Mr. Tudor knew at the time of his subsequent allegedly tortious statements to Dimension One's licensees and potential licensees that the '599 Patent was invalid.

Nevertheless, Coverplay argues that Dimension One did not present any evidence in support of its claim that Mr. Tudor actually knew at the time of his allegedly tortious statements that the '599 Patent was invalid.  (Reply in Supp. of Mot. for Summ. J. at 2-3.)  Even during the pendency of this action, Mr. Tudor denied that the '599 Patent may be invalid.  (*See* Esty Decl. in Supp. of Mot. for Summ. J. on Pl.'s State Law Claims Ex. 2, Tudor Depo. at 101-02.)

The court disagrees that a witness' denial is dispositive on a factual issue such as his own state of mind.

> Since the information relating to the state of mind generally is within the exclusive knowledge of one of the litigants and can be evaluated only on the basis of circumstantial evidence, the other parties normally should have an opportunity to engage in discovery before a summary judgment is rendered.  But even this may not be enough.  Inasmuch as a determination of someone's state of mind usually entails drawing of factual inferences as to which reasonable people might differ – a function traditionally left to the jury – summary judgment often will be an inappropriate means of resolving an issue of this character.

10B Wright, Miller & Kane, Fed. Practice and Proc. § 2730 at 6-7 (3d ed. 1998); *see also Hunt v. Cromartie*, 526 U.S. 541, 553 n.9 (1999).  Accordingly, Mr. Tudor's knowledge can be inferred from circumstantial evidence, including patent invalidity, should it be proven at trial.

Based on the foregoing, Coverplay's motion for summary adjudication of  Dimension One's state law claims based on preemption is denied.

Accordingly, **IT IS HEREBY ORDERED** as follows:

1.     Plaintiff's motion for summary adjudication of literal infringement is **GRANTED IN PART AND DENIED IN PART** and Defendants' motion for summary adjudication of no infringement is **GRANTED IN PART AND DENIED IN PART**.  With respect to the infringement issues, the court finds:

(a) the accused products meet the single pivot means limitation of Claim 1;

(b) a reasonable jury could not believe that, as a factual matter, the requirements

for the proper operation of Coverplay's products and the products embodying the '102 Patent are substantially different insofar as the alignment of the pivot axes is concerned;

       (c) the parties shall file supplemental briefing as provided below on the legal issue whether "common pivot axis" should be construed as mathematically precise alignment of the pivot means; and

       (d) the CoverPro products do not infringe on the '102 Patent.

2.  Plaintiff's motion to strike the invalidity opinions of Defendants' expert Vijay Gupta is **GRANTED**.

3.  Defendants' alternative motion for summary adjudication of patent invalidity is **DENIED**.

4.  Plaintiff's motion for summary adjudication of laches and equitable estoppel is **GRANTED**.

5.  Defendants' motion for summary adjudication of state law claims based on preemption is **DENIED**.

6.  The parties shall brief construction of the term "common pivot axis" as follows:

       (a)  No later than September 19, 2008, Defendants shall file a memorandum of points and authorities no more than ten pages in length and all supporting evidence.  The memorandum shall contain a complete statement of all their arguments in support of their interpretation of the term "common pivot axis" and in opposition to Plaintiff's interpretation.

       (b)  No later than October 3, 2008, Plaintiff shall file a responsive memorandum of points and authorities no more than ten pages in length and all supporting evidence.  The memorandum shall contain a complete statement of all its arguments in support of its interpretation of the term "common pivot axis" and in opposition to Defendants's interpretation.

/ / / / /
/ / / / /
/ / / / /
/ / / / /
/ / / / /

03cv1099

1          (c)  The briefing as provided herein shall supersede and not supplement the

2   parties' piecemeal treatment of this issue in the summary judgment briefing.

3          **IT IS SO ORDERED**.

4

5   DATED:  September 5, 2008

6                                                    _____
                                                     M. James Lorenz
7   COPY TO:                                         United States District Court Judge

8   HON. CATHY ANN BENCIVENGO
9   UNITED STATES MAGISTRATE JUDGE

10  ALL PARTIES/COUNSEL

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

03cv1099